## KNARIAN v. SOUTH HAVEN SAND COMPANY.

1. AUTOMOBILES—PROXIMATE CAUSE—INSTRUCTION.

   Definition of proximate cause *held,* proper in action arising from collision between pickup truck in which plaintiff was a passenger and defendant's car traveling in opposite direction at 6:30 p.m. in mid-December that proximate cause must be the real cause, the actual cause and without intervening cause to assist in bringing the injury about and that it was the natural and proper consequence of the negligence of the defendants and that it was foreseeable by them under the circumstances.

2. SAME—INSTRUCTIONS—NEGLIGENCE—ASSURED CLEAR DISTANCE—SUDDEN EMERGENCY—OBSERVATION.

   The trial court's instructions relative to negligence, assured clear distance, sudden emergency, and duty to observe, wherein the jury was directed to apply the "reasonably prudent person" test in determining whether or not defendant was negligent

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5A Am Jur, Automobiles and Highway Traffic § 1100.
[2] 5A Am Jur, Automobiles and Highway Traffic § 1094.
[3] 5A Am Jur, Automobiles and Highway Traffic § 1013.

*held,* without reversible error and to have been justified by facts in action arising from collision between pickup truck in which plaintiff was a passenger and defendant's car traveling in opposite direction at 6:30 p.m. in mid-December (PA 1949, No 300, § 627, as amended by PA 1957, No 190).

3. SAME—INSTRUCTIONS—GREAT WEIGHT OF EVIDENCE.
   Record presented in action arising from collision between vehicles proceeding in opposite directions at 6:30 p.m. in mid-December *held,* to have required presentation of case to jury, and to show that the court did not invade the province of the jury, that the jury was properly instructed, and that its verdict was not contrary to law or the great weight of evidence.

Appeal from Van Buren; Mosier (Carl D.), J. Submitted June 8, 1960. (Docket No. 29, Calendar No. 48,497.) Decided December 1, 1960.

Case by Zvart Knarian against South Haven Sand Company, a Michigan corporation, and Billy R. Fisk for injuries sustained in automobile collision. Verdict and judgment for plaintiff against defendant Fisk, who appeals. Affirmed.

*Eugene Field,* for plaintiff.

*McAuliffe & Harbert (J. W. McAuliffe,* of counsel) and *Luther I. Daines,* for defendant Fisk.

KELLY, J. Plaintiff was injured on December 13, 1957, when the truck in which she was riding skidded while passing defendant South Haven Sand Company's parked double bottom trailer unit and collided with a Chrysler automobile driven by defendant Fisk.

A jury found defendant Fisk was negligent and assessed damages. It also found defendant South Haven Sand Company was not negligent. Motion for new trial was denied.

Defendant Fisk appeals, claiming the verdict is contrary to law and the great weight of the evidence

and that the court erred in instructing the jury and in denying defendant's motion for directed verdict.

At the time of collision (about 6:30 p.m.) plaintiff was a passenger in a Chevrolet pickup truck operated by her adult son, traveling east on highway M-43 (a paved highway, 20 feet wide), and was going from her home in South Haven to spend the weekend with her children in Kalamazoo.

Plaintiff could give no information as to how the collision occurred, testifying she had no recollection of any of the events subsequent to her departure from South Haven.

The son, who lives in Kalamazoo, had traveled from Kalamazoo to South Haven on highway M-43 in the afternoon of that day, and at a point a little over a mile west of Glendale he observed 2 trailers hitched together which stood with their left wheels on the pavement and their right wheels on the berm. At that time there were snow banks that had been created along the highway and it appeared that the trailers were close to the snow banks on the south side of the highway.

A police officer who investigated after the collision testified: "The trailers were parked on the south side of M-43. The left wheels were 5 feet 6 inches south from the center line."

Plaintiff's son testified that he and his mother left South Haven about 6 p.m.; that the weather and roads were clear and that he drove at a speed of about 40 miles per hour; that as he came over the crest of a hill he could see the trailers some 500 or 600 feet to the east, parked as they were when he passed them in the afternoon; that he reduced his speed as he approached the trailers but increased his speed to pass; that as his truck was passing the rear of the trailers he observed oncoming lights which he thought were far enough away to give him ample time to pass; that he was regaining his posi-

'tion on the right hand side of the road when his 'truck hit an icy patch that had formed around the 'trailers and the truck started to skid with the rear sliding to the left; that his left front wheel had passed the center line when the skid started; that when the skid started the lights of the approaching car were still several hundred feet away; that to stop the skid he turned his front wheels to the left and took his foot off the accelerator; that he was still skidding at the moment of impact, and while he had the front part of his truck over on the south side of the road where it belonged, the rear end was over the center line in defendant's lane; that his truck was 17 feet long and he estimated the distance from the start of the skid to point of collision as 100 feet.

From the testimony of those who made investigation after the collision, we conclude:

(1) Defendant's Chrysler came to rest facing southeasterly across from the front or east end of the parked trailers;

(2) The Chevrolet pickup was 140 feet east of the Chrysler with the left rear wheels 2 feet 8 inches north of the center line and the box of the pickup was 26 feet south of the pickup and a spare tire was out in the field 200 feet away;

(3) There were no skidmarks at the scene of the accident;

(4) After the collision the pickup skidded 40 feet 10 inches and the Chrysler traveled 99 feet 2 inches;

(5) The rear wheels and the rear end of the truck were badly damaged; there was damage to the rear of the cab immediately back of the left door, and the frame was bent;

(6) The bumper of the Chrysler was not damaged to any degree, but the left front of the car was damaged.

The collision threw plaintiff from the truck to the highway, breaking her neck and causing other injuries requiring extensive hospitalization.

Gordon Castle, 27-year old acquaintance and friend of defendant Fisk, was called as a witness by plaintiff. He testified he had accompanied defendant in his car as they left Paw Paw to attend a basketball game at Bangor. The night was clear and the pavement was wet but not slippery; that he sat in the front seat next to the right window; that while driving west on M-43 he observed "a string of flares on the south side of the road down ahead of us, as far as I could see, probably a mile when we first seen them. * * * There was a line of them (flares) pretty well around that truck because they showed up plain when we came in view"; that he saw the headlights of an approaching car as it came over the crest of a hill in the eastbound lane; that he would estimate the flares to be "between an eighth and a quarter of a mile" from the crest of the hill; that the driver of the car he was riding in and the driver of the approaching car dimmed their lights; that when he was 200 to 300 feet away he could see the trailers as the approaching car swung out to pass them; that the approaching car's lights disappeared as the car appeared to pass the trailers and that he next saw the truck 25 to 30 feet away sliding, facing south, and coming broadside toward the car in which he was riding.

On direct examination, Castle stated he did not look at the speedometer, but estimated defendant was traveling 50 to 55 miles per hour, and on cross examination stated that when he observed the flares "it felt to me like he (defendant) let up on the gas."

Defendant denied he saw the lights of the truck approaching him, stating that the first he knew that the Chevrolet pickup was on the road was when it was in front of him only 60 to 70 feet away. As to

what happened from the time he saw the flares is set forth in the following direct examination of defendant:

"*Q*. Have you an opinion as to the speed at which you were traveling after you left Glendale?

"*A*. At approximately 50 mile an hour.

"*Q*. Did you continue that speed as you approached the flares?

"*A*. Not after noticing the flares. I lessened the acceleration at that time.

"*Q*. You lifted your foot off the accelerator?

"*A*. Yes.

"*Q*. And what was the effect of that?

"*A*. As to speed?

"*Q*. Yes.

"*A*. I expect that I slowed down, maybe 10 or 15 miles an hour. I don't know how long it takes to do that. I had plenty of time, I was a long ways away from the flares at that time.

"*Q*. And did you proceed along until you got closer to the flares?

"*A*. Yes, sir.

"*Q*. Have you any opinion any time prior to the moment just before the collision that you reached a speed any lower than 30, 35 miles an hour?

"*A*. No, I don't. I doubt that I did.

"*Q*. As you approached the flares, did you reach a point at any time where you could identify any part, the nature of the vehicles which they surrounded?

"*A*. No, I never did identify them as being trailers.

\* \* \*

"*Q*. Did you observe the approach of the Knarian car, the lights of the Knarian car while it was behind the parked trailers and the flares?

"*A*. I did not, not that I recollect.

"*Q*. Not that you could identify as lights of an approaching automobile?

"*A*. No.

"*Q.* Did you at any time see a light which you now understand was from the Knarian car?

"*A.* Yes, I did.

"*Q.* And what did you see?

"*A.* I merely saw a flash of light. Apparently, it was near the trailers or near these flares. It went across from the north to the south.

"*Q.* You saw a flash of light that went across from the north to the south?

"*A.* Yes. What I saw was what I thought was 1 light. At no time did I see 2 lights.

"*Q.* But you did see a light which seemed to be turning from the north to the south?

"*A.* Yes, like a flashlight in your hand.

"*Q.* And at that time did you form any opinion of what it was?

"*A.* A flashlight.

"*Q.* You thought it was a flashlight?

"*A.* Yes. * * *

"*Q.* Now, at the time that you saw that light, which appeared to you to be a flashlight, did you continue the location of the trailers at about that same speed of 30, 35 miles an hour?

"*A.* I would say I slowed up more at that time. I don't know exactly what speed I was going at the time I saw the flash of light but when I did see that I did slow up after that also. * * *

"*Q.* Have you any idea as to what your lowest speed was prior to the accident?

"*A.* I would expect probably 30 to 35.

"*Q.* Then, would you say when you first took your foot off the accelerator when you came in sight of the flares that your car did not at that time slow to the lowest rate?

"*A.* No, I would say it hadn't."

The cross examination of defendant follows in part:

"*Q.* When did you first commence to slow, sir?

"*A.* When the flares came into vision.

"*Q.* And to what extent was it? Was it a full withdrawal of your foot from the accelerator?

"*A.* No, I would say no. I was some distance from the flares at that time.

"*Q.* Is it possible that you might have continued on at the same general rate of speed?

"*A.* Probably 40, 45. It was just a gradual slow-down.

"*Q.* What did you testify to in response to Mr. McAuliffe's question as to what you did when you saw the flashlight?

"*A.* I slowed down then.

"*Q.* And how did you slow down this time?

"*A.* I took all of the acceleration from the car.

"*Q.* You did?

"*A.* Yes.

"*Q.* That time you removed your foot completely?

"*A.* Yes.

"*Q.* And that's when you saw the flashlight?

"*A.* Yes.

"*Q.* And at that time you could have been 300 feet or less from the trailers?

"*A.* Yes.

"*Q.* When you removed your foot completely from the gas station [pedal ?], did that cause your car to perceptibly cease its forward motion?

"*A.* No.

"*Q.* It didn't?

"*A.* No.

"*Q.* Doesn't it usually do that when you suddenly withdraw acceleration?

"*A.* It's not sudden by any means. It's an automatic transmission. *  *  *

"*Q.* Was there, when removing your foot completely from the accelerator, a sudden cessation in the forward motion of your vehicle?

"*A.* Well, normal.

"*Q.* That's what I want to know, what was normal to you?

"*A.* I wouldn't know how to answer that, sir.

"*Q.* But that was the point at which you completely removed your foot from the accelerator?

"*A.* Yes, sir.

"*Q.* Upon sight of the flashlight?

"*A.* Yes.

"*Q.* What effect did it have in your car?

"*A.* The car?  *  *  *

"*Q.* But you know what you felt?

"*A.* No, not at that time.

"*Q.* Now, do you know what that caused to your speed?

"*A.* Do I know what?

"*Q.* After having removed your foot completely from the accelerator, what did that do to the speed of your automobile?

"*A.* I don't know.

"*Q.* You don't know how fast it was going then?

"*A.* From then on, no.  I never reaccelerated then after that, though.

"*Q.* Then you don't know how fast your car was going from the time you removed your foot from the accelerator?

"*A.* No, I had other things to watch.

"*Q.* Did you tell Mr. McAuliffe you were going 30, 35 mile an hour?

"*A.* Approximately 30, 35 mile an hour, yes.  *  *  *

"*Q.* Do you or don't you know?

"*A.* I don't know."

Defendant's wife was riding in the front seat between defendant and Mr. Castle, and when called as a witness in defendant's behalf testified that she noticed the flares when they were quite a ways away and called attention to same, and "wondered what was the matter out front." When asked whether her husband slowed down after noticing the flares, she answered: "As we approached the flares he slowed down." On cross examination she admitted that when she had been questioned previously under oath as to what her husband did after she saw the

flares and commented on them that she answered: "Nothing, as far as I could truthfully say. I wouldn't say that he slowed up or applied his brakes, either. I don't—he may have taken his foot off the accelerator, I don't know." She testified that she did not see the lights of the approaching automobile, did not see a light coming around the flares, and did not see the truck until it was "right in front of us * * * only the moment before we hit it."

Mrs. Charlotte Castle and 3 girls were riding in the back seat. Mrs. Castle testified that she paid no attention to the road and first realized there was danger when she looked up and saw the truck immediately in front of their car.

The 3 girls in the back seat testified as follows:

Judith Ann Smith: Heard Mrs. Fisk say, "Bill, look out" and she looked up and the truck was "right across in front of us"; hit the truck immediately after that; had not noticed anything prior to that time about the speed of the car in which she was riding.

Connie Bradley: Riding in rear seat, talking, and did not notice the flares; heard Mrs. Fisk say " 'Bill,' or something like that" and looked up and saw the "dark object in front of us"; that at that moment she felt a sensation that the driver had taken his foot off the accelerator.

Kaye Lynn Mikle: Riding in the back seat and paying no attention to the road until "I heard somebody say something, and I can't remember exactly what it was, to the effect that there was a truck ahead of us"; that she looked up and the truck was in front of us and we hit it within a second.

Officer Charles E. Spawr testified that he questioned defendant at the scene of the accident as to what occurred and he said: "From my accident report, I would say that he was going 50 mile per hour, proceeding west on M-43 and observing this other

vehicle, the 1955 Chevrolet pickup, he had applied his brakes and was skidding just prior to the accident, impact."

The court in its instructions to the jury briefly, but properly, outlined plaintiff's and defendant's positions as follows:

"As to defendant Fisk, the plaintiff claims defendant Fisk was negligent, driving at a rate of speed that was excessive under the conditions existing immediately before the collision; that defendant Fisk did not keep a proper lookout of conditions existing on the highway, failed to apply his brakes or slow his motor vehicle or turn to the right to avoid a collision and that these duties were within the power of defendant Fisk to do. For these damages, the plaintiff claims this, that the defendants are guilty of negligence and that their negligence are a proximate cause of the collision and the damages to the plaintiff. * * *

"The defendant denies that he was driving at an improper or excessive rate of speed and defendant contends that he had his car under control at all times until the collision, and he maintains he was keeping a lookout to see what was on the road or in his lane of traffic, and the defendant contends— denies he was guilty of any negligence, and he maintains the impact between the automobile in which the plaintiff was a passenger and defendant Fisk's automobile took place on his, the defendant's, side of the road."

The court warned the jury that the fact "there was an accident and the plaintiff was injured, standing alone does not entitle the plaintiff to damages"; that the burden was upon plaintiff to prove defendant's negligence, and that said negligence was the proximate cause of the accident.

The court clearly defined "proximate cause" stating it must be "the real cause, the actual cause, no cause intervening to assist in bringing the injury

about. In order to constitute proximate cause, it must appear that the accident was the natural and proper consequence of the negligent or wrongful act of the defendants, or either of them, and that it should have been foreseen by them in the light of the attending circumstances."

The court instructed on negligence as follows:

"Now, I have spoken of negligence. The declaration, the suit brought by the plaintiff is based upon allegations of negligence. I shall define that for you. By negligence is meant the doing or omitting to do a thing which a reasonably prudent person would not have done or would not have omitted to do under like or similar circumstances. It has been defined as a failure to observe for the protection of others such care, precaution and vigilance as the circumstances justly demand and the want of which causes the injury."

The court instructed the jury in regard to assured clear distance ahead and sudden emergency, as follows:

"Now, we have in Michigan a motor vehicle code which defines, which I might call the rule of the road, and some of the motor vehicle provisions are applicable in this case and I will read some of them to you.

" 'Any person driving a [motor] vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other condition then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured, clear distance ahead.'*

"Now, the assured clear distance ahead means that space in the direction of moving wherein objects can

---

* CLS 1956, § 257.627, as amended by PA 1957, No 190 (Stat Ann 1957 Cum Supp § 9.2327).—REPORTER.

be seen by the driver and that part of such space as can be traveled by the vehicle under the circumstances existing with reasonable safety to persons and property. It is not enough that the driver be able to begin to stop within the range of his vision or that he use his diligence to stop after discerning an object. The law makes no allowance for delays in action. He must upon discovering an object perform the manual acts necessary to avoid striking such object. The assured clear distance ahead is limited to that traveled portion of the highway that can be seen and observed by the operator of the vehicle and if the same is limited by a brow of a hill or curve or by darkness, then such assured clear distance ahead extends to such limit of vision. Any person who operates a motor vehicle at such rate of speed that same cannot be stopped within the assured clear distance ahead is guilty of negligence as a matter of law.

"Every person operating an automobile must use that degree of care which a reasonably prudent person with ordinary experience would exercise under the same or similar conditions. He or she is bound to exercise care in proportion to the dangers and risks of the highway, commensurate to the dangers naturally incident to the use of such vehicle. In some situations greater care is required than in other situations and a person is required to use such care as is commensurate with the circumstances and conditions, having in mind the weather conditions, time of day or night, the frequency or infrequency of travel of traffic on the highway, and all the surrounding circumstances and conditions attending the time and place of the accident. He is obliged to take notice of the conditions before him and if it is apparent by reason of some particular method or procedure there may be risk or danger, it is his duty to adopt some safer method if with care and prudence he may do so. He may meet perils at any point of the street and he must keep a proper lookout for them and keep his machine under such con-

trol which will enable him to avoid a collision with any other person, use proper care and caution. * * *

"The defendant Fisk in his defense claims under the rule relating to what we speak of as an emergency. An emergency is a sudden and unexpected happening that cannot be reasonably anticipated. A sudden emergency, which is brought on by negligence is a part of the negligence which produced the emergency and such emergency does not relieve the negligent driver who brought on the emergency by his negligence from responsibility therefor. When one is required to act suddenly in the face of imminent danger, the law does not require him to exercise the same degree of care as if he had had time for deliberation and full exercise of judgment, and under such circumstances, he is not required to exercise the care which on careful consideration of the circumstances after the accident it might appear he might have used to avoid the injury. If a person, through no fault on his part, is suddenly placed in a position of peril, the law makes allowance for fright, lack of judgment, excitement, provided the person invoking that rule is not guilty of negligence in placing himself in such a position of peril."

That the jury should apply the "reasonably prudent person" test in determining whether or not defendant was negligent, is further evident from the following excerpt from the court's instructions:

"Every person operating an automobile must use that degree of care which a reasonably prudent person with ordinary experience would exercise under the same or similar conditions."

The court instructed the jury in regard to the duty of looking ahead and observing, as follows:

"You are instructed that it is the duty of drivers of cars to look ahead and see all persons, vehicles, or other obstructions in the line of his vision, and in case of an accident, he will be conclusively presumed to have seen what he should have seen and

that he could have seen in the proper performance and discharge of this duty."

This instruction should have held defendant responsible for seeing that which a reasonably prudent person, exercising due care, should have seen. We do not believe, however, that this instruction was so misleading as to constitute reversible error considering the entire charge, and, particularly, the charge that "every person operating an automobile must use that degree of care which a reasonably prudent person with ordinary experience would exercise under the same or similar conditions."

Appellant claims the court should not have instructed as to the assured clear distance ahead rule because "this rule has no application upon the facts in the instant case."

The facts in the instant case justified the court in instructing on the assured clear distance doctrine or rule. We have considered all of appellant's claimed errors in regard to the court's instructions and find no reversible error.

The court instructed the jury: "It's not for the court to determine or even indicate any opinion concerning the facts in this case. This is solely in the field and the duty of the jury. The credibility of the witnesses is a matter entirely for you to decide." The record discloses that the court was presented with evidence that required a jury verdict; that the court did not invade the province of the jury; that the jury was properly instructed, and the verdict was not contrary to law or the great weight of the evidence.

Affirmed. Costs to appellee.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred.